UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
CIVIL ACTION NO. 3:21-CV-469-CRS

KATHRYN BARKER SMITH                                                    PLAINTIFF

v.

LANDMARK OF IROQUOIS PARK REHABILITATION                 DEFENDANTS
    AND NURSING CENTER, LLC, *et al*

## MEMORANDUM OPINION AND ORDER

This case is a diversity action under Kentucky law. On March 20, 2024, a jury returned a verdict in favor of Plaintiff, Kathryn Barker Smith, on her claim for retaliation in violation of the Kentucky Civil Rights Act. The jury awarded Smith $200,000. Smith also sued for sexual harassment, but the jury found for Defendants on that claim. Smith sued three companies: (1) Landmark of Iroquois Park Rehabilitation and Nursing Center, LLC; (2) Infinity Healthcare Mgmt Consulting of Kentucky, LLC; and (3) Infinity Healthcare Management of Indiana LLC. She alleged that these three entities jointly employed her. The jury agreed. On April 22, 2024, the Court entered a judgment consistent with the verdict. Post-judgment motion practice ensued.

Smith moved for attorney fees and filed a bill of costs. Defendants filed a competing bill of costs and moved for a judgment and for a new trial. Smith moved to strike that motion because it is twice as long as LR 7.1 permits. Smith also opposed Defendants' Bill of Costs. Finally, it had come to the Court's attention that without seeking leave to do so, Defendants hired an investigator to contact jurors and that the investigator had succeeded with respect to at least one juror. The Court barred any further juror contact. As a result, Defendants have moved for leave to contact the jurors. Having reviewed the parties' arguments as well the pertinent portions

of record of this case, the Court will award Smith fees and costs, will deny Defendants costs and will deny all remaining motions.

First, Smith is the prevailing party and Defendants are not; thus, the Court will deny Defendants' costs and award costs to Smith, minus costs for service of process by means other than the U.S. Marshal service. Similarly, the Court will award Smith the attorney fees she seeks. Defendants' objections to those fees lack merit, and the fee amount is supported by uncontested affidavits and sufficiently detailed billing records. Next, Smith's motion to strike, though well-taken, will be denied. This matter is best resolved by full consideration of Defendants' motion for a judgment and a new trial which consideration avoids yet more briefing. Defendants' motion itself, however, will be denied. Defendants have forfeited most of their arguments for a judgment by failing to make them before the case went to the jury. The single preserved argument does not satisfy the standards for a judgment. Similarly, Defendants have failed to present proper grounds for a new trial. Finally, the Court will deny Defendants' motion for leave to contact jurors. Defendants have not given the Court the grounds on which they seek leave, and, to the extent they may wish to ask why jurors reached the verdict they did, such questions are improper.

## BACKGROUND

Smith alleged she was fired because she filed a sexual harassment complaint against her boss, Randy Conforti. Like most retaliation lawsuits, Smith did not have smoking gun evidence. Rather, she relied on circumstantial proof. Defendants maintained that Smith was fired for a non-discriminatory reason: practicing nursing without an active license. Defendants introduced testimony and documents to support their contention, concentrated on evidencing Conforti's career, spent appreciable time trying to bolster his and their other witnesses' credibility, and devoted much effort to challenging Smith's credibility. Smith's rebuttal included proof that her job did not require an active nursing license, that she did not undertake work that required a

license, that other employees whose licenses had lapsed were not terminated, and that the investigation of her complaint was a sham – *i.e.,* proof that Defendants' purported reason for firing her was pretextual. The jury found for Smith. The underlying events took place from late January 2020 through June 26, 2020, and they involve not only the three defendant entities but also several people. The pertinent players and events are set out in more detail below.

*The Business Entities.* Defendant Landmark of Iroquois Park Rehabilitation and Nursing Center, LLC ("Landmark") runs a nursing home facility in Louisville, Kentucky (the "Iroquois Park" facility). Defendants Infinity Healthcare Mgmt Consulting of Kentucky, LLC ("Infinity Kentucky") and Infinity Healthcare Management of Indiana LLC ("Infinity Indiana") oversee nursing home facilities. Their operations are regional in nature. In turn, they are overseen by a company which operates nationally. That company is not a party to this action but its name came up because some of its employees were involved in key events. The national entity is Infinity Healthcare Management, LLC ("Infinity Corporate").

*The People.* Plaintiff Smith began work at the Iroquois Park facility as its Business Office Manager. Randy Conforti was its Administrator. In early 2020, Conforti promoted Smith. She filled a dual role job he had created, a position in which Smith worked as the HR director but also undertook some staff development coordinator duties. Smith testified similarly about her promotion and work assignments. In June 2020, Smith told Carrie Washington that Conforti was sexually harassing her.

Washington, an Infinity Corporate employee, worked as a Regional HR Director. In response to Smith's complaint, Washington involved her boss, Sarah Studley-Carter ("Carter"). Carter, also an Infinity Corporate employee, was the Director of HR and oversaw all regional HR Directors. Chris Ray was also involved. Ray was Infinity Corporate's Chief Operating Officer.

He supervised Carter. Ray was also the Chief Operating Officer of both Infinity Kentucky and Infinity Indiana. Ray and Carter directed how to proceed with the investigation of Smith's complaint. Ken Pflumm was also involved. He was the Regional Director of Operations. He was an Infinity Indiana employee. Pflumm was Conforti's boss, according to Conforti, and could fire Conforti and the other Landmark employees. Conforti also testified that if he wanted to fire someone, he would consult Pflumm. It was Pflumm who told Conforti he had been charged with sexual harassment and who collected Conforti's statement.

Washington collected Smith's statement. She also went to the facility and took statements from its department heads: (1) Lindsay Rockwell, Director of Nursing; (2) Rico Rosado, Social Services Director; and (3) Kim Fanin-Hulsey, Director of Admissions. There was also Tammy Meier and three more. Each provided a statement.

### The Events:

**Smith's Sexual Harassment Complaint.** Smith testified that not long after Conforti promoted her to the HR Director/staff development job, he began making sexually charged comments and introduced sexually charged topics into private conversations with her and into conversations where Director of Admissions Hulsey was also present. According to Smith, over time, Conforti added comments about Smith's appearance, complimenting her looks or manner of dress after having told her that he liked to have sex with married, female co-workers. Also, he spoke of one-night stands and nude photos women sent him. Smith described growing increasingly uncomfortable with being alone with Conforti, stating that Conforti once trapped her at his desk hovering too near while he watched her enter data. Yet, Smith explained, she felt she could not refuse Conforti's insistence on alone-time. He was her boss.

According to Smith, department heads Rico Rosado and Lindsay Rockwell had noticed Conforti's unusual attention. They, along with Hulsey, agreed to help Smith avoid being alone with Conforti. These efforts frustrated Conforti, Smith testified, evidenced by incidents of open hostility toward her. Smith also testified that fellow employees encouraged her to report Conforti. Ultimately, on June 10, 2020, Smith asked Washington to schedule a call. Smith also asked if there was an anti-retaliation policy. Smith testified that she feared making a report would not turn out well for her.

• **_The Investigation._** Smith spoke with Washington, on Friday June 12, 2020.[1] Washington asked for a written statement and told Smith to stay home from work on Monday.[2] Smith sent two statements to Washington on Sunday, June 14, 2020, describing the second one as a revised version. Washington read only the second one.[3] She sent the first one, however, to Ray, Carter and Pflumm for their review.[4] Earlier that day, Washington discussed logistics with, and received directives for how to run the investigation, from Ray, Pflumm and Carter. Although Washington and Carter expected to instruct Conforti to stay home on Monday too, Ray opposed that idea: "Just speak with him today as I don't want a scene tomorrow at the facility. We can look at offering her a transfer as well."[5] The same day, Pflumm told Conforti that a sexual harassment complaint had been made and asked for a statement.[6] Conforti testified that Pflumm did not disclose Smith's identity or the complaint's specifics.[7] Conforti sent his statement to Pflumm at 1:58 a.m. on Monday, June 15, 2020.[8]

---

[1] Transcript of 03/12/24 Proceedings, DN 157 at PageID# 2306: 19-24.
[2] _Id._ at PageID# 2314-15: 13-02.
[3] _Id._ at PageID# 2320: 10-23.
[4] Transcript of 03/13/24 Proceedings, DN 159 at 2615: 06-19; _see also_ Plaintiff's Exh. 12.
[5] 06/14/20 Emails, Plaintiff's Exh. 11.
[6] Transcript of 03/14/24 Proceedings, Conforti testimony, DN 187 at PageID# 3423-24: 21-21.
[7] _Id._ at PageID# 3423-24: 25-25.
[8] _Id._ at PageID# 3426: 01-11.

Later that Monday morning, Washington went to the Iroquois Park facility to investigate. She distributed four questions to the department heads. Those questions were: "(1) What is the general workplace atmosphere like? Any concerns? (2) Are there any problems within your department? (3) Have co-workers complained about inappropriate behavior in the department and or facility? (4) Have you personally noticed or been offended by inappropriate behavior?"[9] Hulsey, Rosado, Rockwell, Maier, and three others provided answers.[10] Washington testified that she did not tell them she was investigating a sexual harassment complaint.[11]

Rockwell's signed, written statement says: "Stated she has witnessed Randy looking at Kathryn that made her feel uncomfortable. Example would be groping with the eyes."[12] Rockwell also stated that she witnessed Conforti make inappropriate comments on Smith's appearance and his efforts to be alone with Smith.[13] Rosado made similar statements in addition to statements about sexually charged comments and behavior by Conforti.[14] Hulsey stated that Conforti discussed women having sent him nude photos and having been accused of sexual harassment in the past. Hulsey also stated that Smith had complained to her about Conforti's making Smith uncomfortable, wanting to be alone with her all the time.[15] Maier also stated that Smith and Hulsey were in Conforti's office all the time which was "weird to her" and that Conforti always wanted to meet with Smith and Hulsey privately.[16] Smith introduced these statements for the purpose of proving the investigation's scope as opposed to for the truth of the matters asserted therein.

---

[9] Plaintiff's Exh. 12.
[10] *Id.*
[11] Transcript of 03/14/24 Proceedings, DN 157 at PageID# 2337: 19-22.
[12] Plaintiff's Exh. 12.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*

No department-head follow up interviews were conducted.[17] No one interviewed Smith about her statement.[18] Although he stated at trial he did not remember if he was interviewed, at his deposition, Conforti testified that no one interviewed him.[19] For their review, Washington sent the statements to Plfumm, Carter and Ray at 1:08 p.m. on Monday, June 15, 2020.[20] Hours later, Smith's complaint was deemed unsubstantiated.[21]

Despite being the Regional HR Director and being responsible for investigating, Washington's trial testimony suggested she did not understand the sexual harassment policy that was in place. To illustrate, "leering" was included in the list of prohibited conduct, yet Washington did not know what "leering" meant. In response to an open ended question, she could not define sexual harassment. Washington spoke of "unwanted" touching or communications, yet struggled and ultimately said, "I don't have a true definition, other than, you know, behaviors of things that the other person doesn't want to receive, treatment."[22] As well, Washington could not say whether review of the sexual harassment policy would have been important.[23] Also, she initially testified, even after reading the policy, that it did not prohibit retaliation – a routine provision. At length, after being repeatedly confronted with its express terms, she agreed it did bar retaliation.[24] By contrast, Conforti testified that sexual harassment policies prohibit retaliation and further that he would get rid of an HR specialist who did not understand that retaliation is prohibited conduct.[25]

---

[17] Transcript of 03/12/24 Proceedings, DN 157 at PageID# 2337: 13-16.
[18] *Id.* at PageID# 2333: 05-11.
[19] Transcript of 03/14/24 Proceedings, DN 187 at PageID# 3427-28: 23-10
[20] Plaintiff's Exh. 12.
[21] Plaintiff's Exh. 6, June 15, 2020 5:43 p.m. text from Smith (stating she was still processing the news).
[22] Transcript of 03/13/24 Proceedings, DN 159 at PageID# 2474: 13-21.
[23] Transcript of 03/12/24 Proceedings, DN 157 at PageID# 2338: 04-09.
[24] *Id.* at PageID# 2310-12: 08-08;
[25] Transcript of 03/14/24 Proceedings, DN 187 at PageID# 3422: 02-04; *id.* at PageID# 3423: 02-18.

While Conforti denied knowing it was Smith who accused him of sexual harassment, Rockwell testified that she certainly knew because Washington told her as much when Washington took Rockwell's statement.[26] Rockwell also testified that everyone put it together: "And then, of course, when you have somebody coming in to a facility that's pretty small, and you only have this small group of leadership, and we're all being asked the same questions, it's not too long before everybody's put two and two together."[27]

- **_Subsequent Events/Pretext._** The next morning, Tuesday, June 16, 2020, Smith went back to work.[28] She testified and introduced a text to evidence Conforti's taking away one of her job duties during that morning's regular staff meeting. Smith testified that Conforti yelled at her during this meeting.[29] Later that day, according to Smith, Rockwell demanded Smith sign a Staff Development Coordinator ("SDC") job description, telling her it was a directive from Conforti. The description stated a nursing license was required.[30] Smith testified she refused to sign, suspecting she was being set up, as her job was not the SDC and did not require a license.[31]

Conforti's testimony about whether Smith's job required a license favored Smith in several respects. Conforti admitted that the SDC job description was not Smith's job description.[32] He also conceded it contained duties that he did not expect Smith to perform.[33] Rockwell similarly testified that Conforti was able to choose from among the listed SDC job tasks.[34] Also, Conforti testified that his intent was to create a role which involved an HR person

---

[26] Transcript of 03/18/24 Proceedings, DN 153 at PageID# 2160: 01-06.
[27] _Id._ at PageID# 2161: 03-06.
[28] Transcript of 03/11/24 Proceedings, DN 147 at PageID# 1951:13-16.
[29] _Id._ at PageID# 1951-52: 17-14.
[30] _Id._ at PageID# 1953-54: 06-03.
[31] _Id._ at PageID# 1955: 13-23.
[32] Transcript of 03/14/24 Proceedings, DN 187 at PageID# 3416: 18-20.
[33] _Id._ at PageID# 3412-13: 23-10
[34] Transcript of 03/18/24 Proceedings, DN 153 at PageID# 2216: 02-03.

and a training person.[35]  Moreover, Conforti testified that nursing homes are heavily regulated, to incurring deficiencies if HR paperwork is in poor condition,[36] and to being tagged if staff were performing clinical tasks without a license.[37] It was his job to ensure that the facility remained compliant. The buck stopped with him.[38] He did testify that the dual role job Smith filled required a nursing license. Yet, he also testified that he did not check to see if Smith had an active license before hiring her for the job.[39] Nor did his Director of Nursing, Lindsay Rockwell,[40] even though, according to Conforti, it was her job to verify nurses' licenses,[41] and Smith was to report to Rockwell in addition to Conforti.[42]

Next, Defendants elicited testimony as to "clinical" work Smith allegedly performed that required a license. Smith undermined that testimony. To illustrate, Washington testified that Smith was fired not for taking the SDC job without a license, but for two discrete clinical tasks: COVID testing and TB tests. On cross, Smith's counsel impeached Washington. At her deposition, Washington testified to COVID testing alone, admitting that she did not know if Smith ever administered a TB test.[43] Further, at her deposition, Washington admitted that she did not know whether COVID testing required a license.[44] Nonetheless, Washington told Smith she could not do COVID tests without an active license:

> You will need to send me something by tomorrow showing your active license. Until then you can only do hr work nothing clinically with

---

[35] Transcript of 03/14/24 Proceedings, DN 187 at PageID# 3414: 03-07.
[36] *Id.* at PageID# 3390: 10-15.
[37] *Id.* at PageID# 3494: 12-15.
[38] *Id.* at PageID# 3387:14-23.
[39] *Id.* at PageID# 3408-11: 22-01
[40] *Id.; see also id.* at PageID# 3539: 13-17.
[41] *Id.* at PageID# 3532: 15-20.
[42] *Id.* at PageID# 3400: 01-12.
[43] Transcript of 03/12/24 Proceedings, DN 157 at PageID# 2403-05: 09-07.
[44] *Id.* at PageID# 2416: 12-17. In fact, Washington admitted that as of trial, she did not know if COVID testing required a license. *Id.* at Lines 19-21.

residents or employees which I don't think you have been doing besides the COVID test.[45]

Washington did not mention TB tests.

At trial, Rockwell testified to COVID test forms signed by Smith but they were never produced.[46] Rockwell also testified to Smith's administering TB tests. Yet, before trial, in a contemporaneous, written statement to Washington, Rockwell stated that Smith need not be involved in clinical operations: "States there has been increase conference calls since COVID-19 and that is in relation to Clinical, and she doesn't understand why Kathryn is so involved but he prefers her at all clinical meetings."[47] At trial, Rockwell testified that her comment should have been recorded as being about "Christina," not Smith. However, Rockwell walked back this testimony.[48] Then, she gave the jury a reason to distrust her and the Infinity team when asked why she signed the statement, knowing it was inaccurate:

> Q. Then why did you sign this statement?
>
> A. Probably to get it over with and go on about my day.
>
> Q. Yeah. And let the chips fall where they may with regard to Randy Conforti and Kathryn Barker, is that what you decided as director of nursing, ma'am?
>
> A. What I decided in that particular moment, and I remember specifically, because I was really disheartened by how inappropriate and nonconfidential the entire investigation was handled, honestly.[49]

Next, Ray testified that Smith was fired because she did not have a nursing license and did clinical work knowing she was not licensed. However, he could only name TB testing and admitted to recalling that information only after he was prepared for his deposition, which

---

[45] 06/24/20 7:28 p.m. Text from Washington, Plaintiff's Exh. 6.
[46] Transcript of 03/18/24 Proceedings, DN 153 at PageID# 2260-61: 06-08.
[47] Plaintiff's Exh. 12.
[48] Transcript of 03/18/24 Proceedings, DN 153 at PageID# 2241:11-22.
[49] *Id.* at PageID# 2244: 08-16.

according to Ray, refreshed his recollection. He could not recall any other clinical tasks. He also got fundamental facts as to why Smith's license was inactive wrong. He testified to believing that her license was taken away, but Smith had surrendered it.

In addition to undermining whether her job required a license, Smith also undermined the contention that her lack of an active license required her termination. Washington testified that she conducted quarterly licensure audits. Notably, Washington decided to audit about a week after she and the rest of the Infinity team rejected Smith's sexual harassment complaint. Then, on June 24, 2020, via text, Washington asked Smith if she knew her RN license had lapsed.[50] As for the consequences of a lapsed license, Landmark testified that it did not fire such employees; rather its policy was to give them a week to fix the problem.[51] Yet, Smith was fired in fewer than 48 hours from the time Washington demanded Smith prove she had an active license. Further, Washington's audit resulted in a list of several CNAs, LPNs, and RNs whose licenses were inactive or had restrictions.[52] No one else on Washington's list who tried to rectify their license status was fired.[53]

Smith was fired on June 26, 2020—just 12 days after Washington collected her sexual harassment complaint. Smith elicited testimony from more than one defense witness to show Conforti had a hand in firing her. Ray testified that Conforti was involved.[54] LaToya Wright testified that, after being behind closed doors with Washington, Conforti directed her to fill out a termination form for Smith.[55] Rockwell testified that it was she, Washington and Conforti who

---

[50] Plaintiff's Exh. 6.
[51] Transcript of 03/13/24 Proceedings, DN 136-3 at PageID# 1374-75: 15-02; *id.* at PageID# 1378:01-07.
[52] Plaintiff's Exh. 13.
[53] The only other employee who was fired was a CNA who took no steps to rectify his inactive license status. Transcript of 03/12/234 Proceedings, DN 157, Washington testimony at PageID# 2398: 07-14.
[54] DN 136-2 at PageID# 1348: 10-18 (Ray testimony).
[55] Transcript of 03/12/24 Proceedings, DN 177 at PageID# 3159-60: 20-14.

made the decision, and, ultimately, it was Conforti.[56] Rockwell also testified that at that time she knew that Smith had filed a sexual harassment complaint against Conforti and assumed Conforti knew it too.[57] Unsurprisingly, Conforti denied participating in the decision.[58]

## ANALYSIS

### A. Motion to Strike

Smith has moved to strike Defendants' motion for a judgment or new trial because it violates the 25-page limit set by LR 7.1. Defendants' motion is 50 pages long. Smith asserts that the excess is unjustifiable since Defendants did not seek leave to double their brief's length or make any apparent effort to keep to 25 pages. Defendants assert that there is no real violation because there are three of them and LR 7.1 affords them 25 pages each, or 75 pages together.

Defendants' argument rings hollow. They are jointly and severally liable to Smith, their interests united. None asserts that any of its grounds for relief applies solely to it. Further, Defendants provide no rationale as to why they could not meet the 25-page limit. Thus, striking the motion would be well within the Court's discretion. *See Amer. C.L. Union of Ky. v. McCreary Cnty. Ky.*, 607 F.3d 439, 451 (6th Cir. 2010) (district court has discretion to strike late filing). However, the Court finds that this matter, including Smith's interest in conserving resources, is better served by considering the entirety of Defendants' motion. Striking it would only result in more filings. Any such order would direct refiling to comply with LR 7.1 which, in turn, would require another response and another reply. Thus, although Smith's challenge is well-taken, the Court will deny her Motion to Strike.

---

[56] Transcript of 03/18/24 Proceedings, DN 153 at PageID# 2228-29:25-05.
[57] *Id.* at PageID# 2230:15-25.
[58] Transcript of 03/14/24 Proceedings, DN 187, at PageID# 3444: 20-25.

**B. Motion for a Judgment**

Defendants have moved for a judgment on Smith's retaliation claim and her claim that they jointly employed her. A federal court sitting in diversity applies state law when evaluating the substantive issues raised by such motions. *J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co.,* 936 F.2d 1474, 1482 (6th Cir. 1991). Here, Kentucky law governs the substantive issues and also provides the applicable standard of review. However, federal law governs procedural issues. *Peak v. Kubota Tractor Corp.*, 559 F. App'x 517, 521 (6th Cir. 2014) (federal law governs procedural issues in diversity actions); *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012) (same). Specifically, Federal Rule of Civil Procedure 50 governs the procedure.

Rule 50(a) provides for motions for a judgment as a matter of law during trial. Such motions must be made before the case goes to the jury. FED. R. CIV. P. 50(a)(2). Rule 50(b) permits only a renewal, post-verdict, of a party's pre-verdict Rule 50(a) motion(s). Thus, a party who fails to make a Rule 50(a) motion waives its right to move under Rule 50(b). Similarly, "'[b]ecause the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion.'" *Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 491 (6th Cir. 2008) (quoting 2006 Advisory Comm. Note). This requisite protects "'the plaintiff's Seventh Amendment right to a jury trial'" by "'requiring that parties raise important issues *before* the case is submitted to the jury.'" *Id.* at 492 (emphasis in original) (citation omitted). Thus, while courts "'usually take a liberal view of what constitutes a pre-verdict motion sufficient to support a post-verdict motion,'" the Rule 50(a) motion must have "provided notice to the court and opposing counsel" of the same alleged deficiencies in the opposing party's case which are raised in the Rule 50(b) motion. *Id.* at 492; 493 (emphasis in original) (citation omitted). Accordingly, "[e]ven where a party has made some reference to an issue in a Rule 50(a) motion that it later invokes as the basis for its renewed motion under Rule 50(b), the

issue is not preserved if it was not raised in a sufficiently substantial way in the earlier motion." *CFE Racing Prod., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 583 (6th Cir. 2015) (citation omitted). Defendants did not put Smith on notice of most of the arguments they now make in their post-verdict motion.

Defendants made three Rule 50(a) motions before the case went to the jury. First, they moved for a judgment on Smith's sexual harassment claim. Because they won on that claim, Defendants take no issue with it now. Second, they argued that Smith failed to prove that she was jointly employed by Infinity Indiana. Defendants made this motion at the close of Smith's case and again after the close of all the evidence. Third, they moved for a judgment on Smith's retaliation claim after the close of all the evidence. They argued that Smith failed to controvert the testimony of Ray, Rockwell, and Washington to the effect that Smith was fired because she had practiced nursing without a license (as opposed to being fired for making a sexual harassment complaint). Now, they make several new arguments. First, they seek a judgment that Infinity Kentucky was not a joint employer. Second, they raise new arguments as to evidence for the conclusion that Landmark was Smith's sole employer and they seek a judgment on Smith's retaliation claim based on never-before raised arguments. All these new arguments are waived. There is one properly renewed argument, but it lacks merit. For these reasons, Defendants' motion for a judgment will be denied.

### 1. Rule 50(b) Motion – Joint Employers

Defendants did not make a Rule 50(a) motion as to Infinity Kentucky's status as a joint employer. Instead, counsel expressly limited the motion to Infinity Indiana:

> MR. SWORD: And we move for directed verdict on
> Infinity of Indiana as plaintiff has failed to reach its proof.
>
> THE COURT: As what?
>
> MR. SWORD: As plaintiff has failed to reach its

proof.

THE COURT: Okay. Just Infinity of Indiana?

MR. SWORD: Just Infinity of Indiana.

Transcript of 03/15/24 Proceedings, DN 182 at PageID# 3331-32: 25-6. In response, Smith asserted that Pflumm, an Infinity Indiana employee, played a direct role in events. In rebuttal, Defendants rested on certain testimony by Ray:

> MR. SWORD: We just heard Chris Ray's testimony that when Carrie Washington came to Landmark of Iroquois Park, she was doing so on behalf of Infinity Healthcare Management of Kentucky, because it's a Kentucky facility, not an Indiana facility. They did not establish that Mr. Pflumm worked for them.

*Id.* at PageID# 3332: 13-18. The Court denied the motion.

At the close of the evidence, Defendants renewed their motion, again limiting it to Infinity Indiana:

> MR. SWORD: It's just a renewal of our motion for directed verdict on the joint employer of Infinity of Indiana. Chris Ray's testimony upon cross clarified that when Ken Pflumm came to Kentucky and acted on a Kentucky facility, he was doing so on behalf of Infinity of Kentucky. Infinity --
>
> THE COURT: Your motion is as to Indi -- Infinity of Indiana?
>
> MR. SWORD: Yes, Your Honor.

Transcript of 03/19/24 Proceedings, DN 188 at PageID# 3597:14-21. In response, Smith made the same argument as to Pflumm's involvement and contended that at the very least, the proof was conflicting. *Id.* at PageID# 3597-98: 23-03. The Court denied the motion again.

Now, Defendants seek a judgment declaring that ***Infinity Kentucky*** did not jointly employ Smith. Because Defendants failed to make this motion at trial, the Court need not consider it now. *Ford*, 535 F.3d at 491. To the extent their joint-employer arguments are made on behalf of Infinity Indiana, Defendants have likewise forfeited them. First, Defendants assert

that because they are not an integrated enterprise, no joint employment existed. They argue about common ownership, interrelated operations, common management, and centralized control. They raised none of this before the case went the jury and cannot do so now. *Ford*, 535 F.3d at 491; *Cranpark, Inc. v. Rogers Grp., Inc.*, 821 F.3d 723, 736 (6th Cir. 2016) ("When a party fails to raise an argument in its Rule 50(a) pre-verdict motion, it is precluded from making a Rule 50(b) post-verdict motion on that ground.").

Next, Defendants argue that "the evidence admitted at trial" does not support the conclusion that Infinity Indiana was Smith's joint employer. Motion, DN 163 at PageID# 2699. They argue about the ability to hire, fire, and discipline; affect pay and benefits; and directly supervise performance. They argue that Landmark hired Smith and she was subject to discipline by Conforti, another Landmark employee. They assert that Infinity Indiana had no power to fire Landmark employees and had no authority over who is employed at Landmark.[59] They contend that "Landmark of Iroquois Park's governing body was responsible for any employment action(s) taken" in Smith's case and cite a never-before-mentioned federal regulation for this assertion. Motion, DN 163 at PageID# 2701. They make assertions about who paid Smith, her personnel records, and performance evaluations for the proposition that Landmark alone employed her. Defendants raised none of this before the case went to the jury. Instead, they argued only that Pflumm was acting on behalf of Infinity Kentucky, based on certain testimony by Ray. Defendants have not renewed this ground in their Rule 50(b) motion. Indeed, their Rule 50(b) motion makes no mention of Pflumm at all. Instead, Defendants make never-before-raised arguments which cannot be heard. *Ford*, 535 F.3d at 491-94; *Cranpark,* 821 F.3d at 736.

---

[59] Conforti's testimony conflicts with this assertion. Plfumm was an Infinity Indiana employee. Conforti testified that Pflumm recruited him, was his boss, was able to fire him and was able to fire other Landmark employees.

**2. Rule 50(b) Motion – Retaliation**

At trial, Defendants offered testimony from Ray, Rockwell and Washington for the proposition that Smith was fired because she had practiced nursing without a license. Defendants made a Rule 50(a) motion based on that testimony, contending it was uncontroverted:

> MR. STEINBERG: According to the instruction, Your Honor, the plaintiff must prove that she had -- had she not complained, she would not have been fired. The uncontroverted testimony and evidence in this case, from Chris Ray, Lindsay Rockwell, Carrie Washington, was that she was terminated because she was practicing nursing without a license. There's been innuendo and suggestions that -- the proximity in time, but the only evidence that was entered before Your Honor was that the sole reason she was terminated was because she was practicing nursing without a license. I don't recall any evidence that was presented to suggest otherwise. So for that reason, we believe her retaliation claim must fail.

Transcript of 03/19/24 Proceedings, DN 188 at PageID# 3588-89: 22-08. Smith responded, and in reply, Defendants reiterated the same ground for Rule 50(a) relief: "There is no evidence, other than she had to be fired, because she was practicing medicine without a license knowing that she wasn't licensed." *Id.* at 3596: 02-04.[60] The Court denied the motion. *Id.* at 3596: 21.

In their Rule 50(b) Motion, Defendants present three new arguments. First, they contend that Smith violated the employee handbook she signed which gave legitimate cause to fire her. More specifically, they assert that Smith knew that the handbook required her to produce an active license and further that her failure to do so could result in termination, that Washington demanded such proof, that Smith failed to give it, and so Smith was fired. Second, Defendants assert that Smith failed to prove that employees outside her protected class who were flagged for lack of a license were treated differently. Third, Defendants maintain that Washington's license audit is an intervening event that "dispels any inference of retaliation," such that Smith cannot

---

[60] The rest of Defendants' reply attacked Smith's credibility. *Id.* at PageID# 3593-95:18-20. Witness credibility is not a proper ground for Rule 50 relief, that issue being exclusively reserved for the jury. *Asbury Univ. v. Powell*, 486 S.W.3d 246, 257 (Ky. 2016) (citation omitted).

prove causation. Motion, DN 163 at PageID# 2666. By not raising them before the case went to the jury, Defendants have forfeited all these arguments. *Ford*, 535 F.3d at 491; *Cranpark*, 821 F.3d at 736. Nor does counsel's vague, pre-verdict reference to temporal proximity rescue their newly raised causation argument. *CFE Racing*, 793 F.3d at 583.

To the extent Defendants have renewed their motion on the same ground raised pre-verdict, their argument fails to satisfy the requisite standards for Rule 50 relief. At trial, Defendants pursued the theory that Smith was fired for practicing nursing without a license. On cross and direct, Smith elicited testimony which suggested that this proffered reason for her termination was pretextual. As a result, granting Defendants a judgment at trial would have been improper and it remains improper.

"In diversity cases, a federal court applies a state-law standard of review when a Rule 50(b) motion is based on a challenge to the sufficiency of the evidence necessary to support the jury's verdict." *Lewis v. Quaker Chem. Corp.*, 229 F.3d 1152 (6th Cir. 2000) (table decision). Specifically, Kentucky's standards for directed verdict motions apply to Rule 50 motions in federal court. *Id.* at *6. Under Kentucky law, a trial court cannot direct a verdict "unless there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ." *Bierman v. Klapheke*, 967 S.W.2d 16, 18-19 (Ky. 1998). Moreover, a "motion for directed verdict admits the truth of all evidence which is favorable to the party against whom the motion is made." *Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 860 (Ky. 1988). Similarly, the trial court must "'draw all fair and rational inferences from the evidence in favor of the party opposing the motion . . . .'" *Kroger Co. v. Willgruber*, 920 S.W.2d 61, 64 (Ky. 1996) (citation omitted). The "judge may not consider the credibility or weight of the evidence, the evaluation of which being solely a function of the fact-finding jury."

*Asbury Univ. v. Powell*, 486 S.W.3d 246, 257 (Ky. 2016) (citation omitted). Moreover, "whenever there is conflicting proof, the court must reserve to the jury the determination and resolution of such conflicts." *Id.* (citing *Bierman*, 967 S.W.2d at 19).

The jury found for Smith on her retaliation claim. Defendants argue that the Court should override that verdict because they presented some testimony from Hoffman,[61] Ray and Rockwell that Smith was fired for the unlicensed practice of nursing. Defendants also note that Smith conceded she had not reinstated her license and that they fired a certified nursing assistant for his lack of an active license, lending support to their proffered reason for firing Smith. These arguments do no more than urge the Court to weigh certain evidence offered by Defendants, assess their witnesses' credibility, and rule in their favor—a request that is out of bounds. *Powell*, 486 S.W.3d at 257. They do nothing to dispel the fact that Smith elicited testimony to show that Defendants' proffered reason for firing her was pretextual. Given the resulting conflicting proof as to why Smith was fired, the Court was correct to send the case to the jury. *Id.*

Smith showed that she was the only person in Washington's audit with a dual role job. She also elicited testimony to show that her dual role job—HR and staff development—did not truly require her to have a nursing license. *See* Background Section, *infra*. For example, Defendants urged that Smith was the HR Director and the Staff Development Coordinator (the "SDC"). They contended that the SDC job required a nurse's license and relied on an SDC job description for that proposition. However, Conforti testified that the SDC job description did not describe Smith's job and that he expected her to perform only some of the tasks listed therein. Also, both Conforti and Rockwell—the two responsible for regulatory compliance—testified that neither checked Smith's license before she took the dual role job. Smith also undermined defense

---

[61] Defendants did not rely on Hoffman's testimony in their Rule 50(a) motion. However, they argued that their proof showed Smith was fired for lack of a license, and the testimony they cite from Hoffman goes to that issue.

testimony to the effect that she had performed clinical tasks—TB and COVID testing—that required a license. *Id*. In two instances, Smith relied on contemporaneous documents: (1) a text from Washington mentioning only COVID testing and (2) Rockwell's written statement wherein she said Smith need not be involved in clinical operations. *Id*.

Further, Smith elicited testimony to show that the Infinity team's investigation of her sexual harassment charge was a sham. *Id*. Washington did not understand the policy and would not say that reviewing it was important to the investigation. The top boss'—Chris Ray's— immediate response to her charge was to suggest Smith be transferred and to permit the alleged sexual harasser, Conforti, to stay in the workplace: "Just speak with him today as I don't want a scene tomorrow at the facility. We can look at offering her a transfer as well," Ray wrote to the Infinity team. 06/14/220 12:44 p.m. Ray Email, Plaintiff's Exhibit 11. Smith also undermined Defendants' contention that her alleged performance of clinical tasks required her termination. Landmark testified that its policy was to give employees with lapsed licenses a week to fix issues. Smith was fired within 48 hours. *Id*. Finally, Smith elicited testimony to show that the alleged harasser, Conforti, took part in the decision to fire her and testimony from Rockwell to suggest that Conforti knew Smith was the complainant. *Id*.

In short, there was proof that favored Smith and disputed material facts as to the real reason Smith was fired. Yes, Ray, Rockwell, Hoffman and Washington testified she was fired for doing clinical tasks without an active license. However, as set out above, Smith undermined that testimony, creating both proof in her favor and disputed issues of fact. Kentucky law precludes entry of a judgment in Defendants' favor under these circumstances. *Powell*, 486 S.W.3d at 257; *Washington v. Goodman*, 830 S.W.3d 398, 400 (Ky. Ct. App. 1992) (trial court is precluded

from entering directed verdict unless there is complete absence of proof on material issue or if no disputed issue of fact upon which reasonable minds could differ exists).

## C. Rule 59 Motion for a New Trial

Federal law and Federal Rule of Civil Procedure 59 govern motions for a new trial. *Nejo v. Tamaroff Buick Honda Isuzu Nissan*, 88 F. App'x 881, 886 (6th Cir. 2004). Defendants argue that (1) juror bias and/or (2) the inclusion of an after-acquired evidence instruction entitle them to a new trial. Defendants contend that the Court erred by giving an after-acquired evidence instruction because Smith was untimely in tendering it and because the instruction was misleading. The Court finds no merit in these arguments. As for their juror-bias argument, Defendants have not shown deliberate concealment or actual bias, so their argument fails.

### a. Juror Bias

As a part of *voir dire*, potential jurors were provided a list of trial witnesses and were asked to disclose if they recognized anyone on the list. The list included Dominique Lyons. On the fifth day of trial, after Lyons testified, Juror No. 12 recognized her and brought the matter to the Court's attention. The Court questioned Juror 12 about the nature of the relationship between her and Lyons. The Court established that Juror 12 recognized Lyons as a former Pilates instructor; however, until trial, Juror 12 did not know Lyons' last name:

> THE COURT: I understood that you realized yesterday that you had had an acquaintanceship with the woman who testified last with the blond hair. I think her name was Dominique Lyons; is that right?
>
> JUROR: Yes. She was my Pilates instructor, so I didn't know her last name.

Transcript of 03/15/24 Proceedings, DN 182 at PageID# 3297-98: 22-02. Upon further examination, Juror 12 stated that she took classes "maybe two or three times a week . . . over

maybe a two-year time period, and then during COVID, there were some online classes . . . ." *Id.* at PageID# 3299:11-16. They never socialized with one another. *Id.* at PageID# 3309: 04-15.

Further, Juror 12 had no opinion as to Lyons' truthfulness and stated that her previous relationship would not affect her evaluation of Lyons' testimony:

> THE COURT: Okay. And I guess the real question is: Would that influence in any way your looking at her testimony and listening to it along with the other testimony in this trial and reaching a verdict without giving consideration for the fact that you had, apparently, some type of acquaintanceship with her a couple of years ago?
>
> JUROR: I don't think so. You know, it was -- I don't know her well enough to know whether -- what her judge of character or what --
>
> THE COURT: Okay.
>
> JUROR: -- her situation was.

*Id.* at PageID# 3300: 07-17.

> THE COURT: . . . Well, the question is: Would you pay more attention to or pay more credibility to her testimony than you would the others –
>
> JUROR: No.
>
> THE COURT: -- in this case just because you knew her in the context of doing a Pilates routines a couple times a week for a while?
>
> JUROR: I don't think so.

*Id.* at PageID# 3301: 06-13.

"There are two ways in which a party seeking a new trial based on a juror's concealment of information can obtain a new trial." *U.S. v. Solorio*, 337 F.3d 580, 595 (6th Cir. 2003). The means depend on whether or not the juror deliberately concealed information. *Id.* If a juror deliberately concealed information, the movant must show that (1) during *voir dire*, the juror did

not honestly answer a material question and (2) the honest answer would have provided a valid basis for a challenge for cause. *Id.* (citation omitted). In such situations, bias may but need not be inferred. *Id.* (citation omitted). If a juror did not deliberately conceal information, "'the movant must show actual bias' in order to obtain a new trial." *Id.* at 595-96 (quoting *Zerka v. Green*, 49 F.3d 1181, 1186 (6th Cir. 1995) (emphasis removed).

As in the *Solorio* case, Defendants "have not shown that they are entitled to relief under either of these prongs." *Id.* at 596. The Court found Juror 12's answers to be plausible at trial and Defendants have not presented anything which contradicts that conclusion. First, there is nothing to indicate that Juror 12 concealed her acquaintance with Lyons during *voir dire.* Defendants concede this fact. Indeed, Juror 12 did not know Lyons' surname until trial. Next, contrary to Defendants' assertion, Juror 12 did not become certain she recognized Lyons upon her entry into the courtroom. The Court asked Juror 12 when she recognized Lyons. In response, Juror 12 stated it was after Lyons finished testifying: ". . . when she was on the stand, it took -- I still had to, like, relook . . . . so her voice didn't really sound how I'm used to it, but it was her, so, afterwards, I knew, you know, that." Transcript of 03/15/24 Proceedings, DN 182 at PageID# 3308:08-17. Moreover, Juror 12 alerted the jury administrator to her recognition which bolsters the conclusion that she was not trying to hide it.

Also, there is nothing to show that Juror 12 was actually biased. The Court repeatedly asked if her prior acquaintance would have any effect on her perception of Lyons' testimony. Juror 12 assured the Court that it would not. Defendants' quibbling over one instance of her use of "I don't think so," as being demonstrative of her harboring doubts, simply falls flat. The Court gave Juror 12 more than one chance to express bias. She expressed none, and she did give an unequivocal "No":

> THE COURT: Okay. And to be sure, you -- would your familiarity with this witness cause you to give her testimony greater credibility than you would any other witness just because you happened to take Pilates from her?
>
> JUROR: No. I think of it as if it was, you know, someone who was maybe a bartender that you saw a couple times or you went to get your car fixed, and the guy who sat at the front desk. I don't know them any more than just what that service was.

Transcript of 03/15/24 Proceedings, DN 182 at PageID# 3310-11:19-02. Further, Juror 12 did not have a close relationship with Lyons. They did not socialize. Their acquaintance ended two years before trial began and was of a limited duration. Juror 12 answered the Court's questions candidly and her demeanor gave no indication of any doubt or bias in her responses. She also swore that her answers were the truth. *Id.* at PageID# 3329:14-19.

Nor is the Court persuaded by Defendants' argument that the $177,895 emotional-harm damage award and the two-hour duration of deliberations evidences a tainted jury pool. This argument is nothing but conjecture. Duration may simply be indicative of a convincing case by Smith as to retaliation. Also, while Lyons did testify as to Smith's emotional harm, she was not the sole witness on this issue. Smith also testified to the toll that Defendants' conduct took on her. Thus, the jury could have set aside Lyons' testimony and awarded emotional harm damages based on Smith's testimony. Finally, the cases on which Defendants rely do not help them. To the contrary, they are inapposite. The language cited by Defendants from *Dillman v. Ind. Ins. Co.*, 2005 U.S. Dist. LEXIS 8646, at *6 (W.D. Ky. May 9, 2005) concerned a Kentucky common law claim for intentional infliction of emotional distress ("IIED") and the showing necessary to state that claim—not standards governing emotional harm damages generally or under the Kentucky's Civil Rights Act. *Craft v. Rice*, 671 S.W.2d 247 (Ky. 1984) concerned the same IIED standard which is why *Dillman* cites it.

**b. After Acquired Evidence Instruction**

On March 19, 2024, Defendants rested their case. Smith also stated that she had concluded her presentation of evidence. Transcript of 03/19/24 Proceedings, DN 188 at PageID# 3579-80: 25-03. The same day, Smith tendered a written after-acquired evidence instruction. *Id.* at PageID# 3601:02-11. Defendants contend that she was untimely. This argument ignores Fed. R. Civ. P. 51(a)(2)(B) which gives the Court discretion to accept such late filings. Thus, even if the Court assumes Smith was late, it could entertain the submission. Defendants' contrary assertion is simply wrong.

Second, Defendants argue that the instruction was improper because they discovered Smith performed clinical work without a license before they fired her. The Court did not give the instruction based on that evidence, however. Next, according to Defendants, the instruction was misleading because "no 'after-acquired' evidence was ever tendered to the jury". *Id.* at PageID# 2685. That contention is also wrong. Other evidence which fit the after-acquired rule was introduced—something defense counsel admitted, twice. Transcript of 03/19/24 Proceedings, DN 188 at PageID# 3602; Transcript of 03/20/24 Proceedings, DN 172 at PageID# 2748.

Nor was the instruction "initially delivered to the jury incorrectly." Motion, DN 163 at PageID# 2685. Yes, Defendants objected to the Court's initial draft, but that happened before the Court instructed the jury. Furthermore, the Court sustained Defendants' objection and used the language Defendants said was the proper cure. Transcript of 3/20/24 Proceedings, DN 172 at PageID# 2747-49: 22-24; 11-04. Nor is there a basis in fact for Defendants' assertion that the Court bungled its delivery of the instruction. Defendants fail to cite to the record for this proposition, and the record shows that the Court read the instruction accurately and without objection. *Id.* at PageID# 2853-70 (jury instructions given). Being contrary to fact, Defendants' bungled-instruction contention cannot serve as ground for a new trial.

25

Nor have Defendants provided a cogent argument based on *U.S. v. Peterson*, 569 F. App'x 353 (6th Cir. 2014). The instruction at issue in *Peterson* concerned what a jury may infer from the fact that a criminal defendant fled the scene. *Id.* at 354-55. The Court of Appeals affirmed, finding no error given that evidence of flight—although thin—was introduced at trial. *Id.* at 356. Here, Defendants acknowledged that after-acquired evidence was introduced at trial. Thus, just as in *Peterson*, the instruction was based on the evidence and the Court did not err in giving it.

Finally, contrary to Defendants' argument, the Court did not exclude certain TB test forms as after-acquired evidence. The Court excluded the forms because Washington could not testify that they were the same ones on which she had relied; thus, the particular forms Defendants wanted to admit were not relevant:

> Well, the problem here is that . . . you got her to say that she was aware of the plaintiff signing off on tuberculosis testing forms. So -- and then she said, "yes, these are the" -- these forms were reviewed, but we don't know which ones they were.
>
> . . . I'd have to have some testimony from her that these are what she had, and . . . I don't think, from what she said, that it can be shown that those particular documents are relevant . . . .

Transcript of 03/19/24 Proceedings, DN 188 at PageID# 3585-86: 23-03; PageID# 3586-87: 23-06, respectively. Nor did the Court prevent the jury from considering Washington's testimony that TB testing was discovered before and partly informed the decision to fire Smith. Indeed, defense counsel argued in closing that such was not after-acquired evidence. Transcript of 03/20/24 Proceedings, DN 172 at PageID# 2795: 06-22.

**D. Motion for Attorney Fees**

The Court finds that Smith should recover the full amount of her attorneys' fees, *i.e.,* $357,642.50. Smith's fee request relates to the time spent over the course of two years by her

counsel of record, Keith Ransdell and David Royse. Smith seeks an hourly rate of $350 for both Ransdell and Royse.[62] Attorney Ransdell was lead counsel. He expended "836 hours" on Smith's case whereas Royse expended "191.6 hours." Motion, DN 139-1 at PageID# 1432. Smith's counsel professionally and competently litigated this case to a successful conclusion despite protracted discovery disputes, difficult proof issues, and different sets of defense attorneys. The claims set forth were not straightforward and witness testimony was often self-conflicting, requiring adept mustering of proof and cross-examination. Given all the circumstances, the Court concludes that Smith's fee request is reasonable and commensurate with this case's complexities. Further, Defendants have not presented objections that warrant reducing the fees Smith seeks.

Indeed, Defendants do not contest either the $350 hourly rates or the number of hours spent. Rather, they contend that Smith should not be awarded the full amount of her fees because she did not achieve 100% success, winning only 1 of 2 claims and recovering only 20% of the damages she sought. As a result, they posit that Smith should get only 50% of her fees, or 20% of her fees, or, given that she likely had a 40% contingency fee contract, her fees should be capped based on that percentage. These challenges are contrary to Kentucky law which governs the fee award in this diversity action. Like the federal courts, the Kentucky courts have rejected mechanical fee reductions based on number of claims won, ratios of damages won compared to damages sought, and contingency fee contracts.

Further, Smith submitted 25 pages of billing records for all time spent by her attorneys. Those records identify which attorney performed the work, the time each spent on that work, and descriptions that adequately describe the nature of the work performed. The Court has reviewed

---

[62]Smith filed the Affidavits of local attorneys John C. Miller and James "Bo" Bolus to support the $350 hourly rates (DN 139-4). Smith has not, however, put unredacted copies of the billing records of her fees into the record. Accordingly, the Court shall order the Clerk to substitute the unredacted versions for the redacted versions and file the unredacted versions.

each billing entry and finds that the amount of time and overall fees are reasonable given the nature of the proceedings in this case; counsel's reputation, experience and skill; and the governing law. The Court found no indication that the time spent was unwarranted or indications that Smith's attorneys failed to exercise good billing judgment.

To the contrary, the billing records reflect a thoughtful division of labor. As lead counsel, Ransdell spent the most time, and it is clear that Royse came in to help as the case came nearer to trial and assisted with the trial. Additionally, although his time was warranted, attorney Royse did not bill for 5.7 hours he spent to prepare video deposition transcripts and to prepare for and attend the pretrial conference in this case. Finally, Smith succeeded on two significant and central issues, namely that Defendants jointly employed her and that they retaliated against her because she reported sexual harassment. Accordingly, she succeeded in remedying a civil rights violation and vindicated "'a policy that Congress considered of the highest priority,'" *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 824 (6th Cir. 2013) (citation omitted). It is also a policy which Kentucky expressly adopted. KRS 344.020(1). This result warrants a full fee award.

**1. Governing Law**

"Where, as here, federal jurisdiction is based on diversity of citizenship, an award of attorney fees is governed by state law." *Bailey v. Scoutware, LLC*, 599 F. App'x 257, 258 (6th Cir. 2015) (citation omitted). Thus, Kentucky law governs the method used to calculate the amount of an award. "When calculating attorney fees pursuant to KRS 344.450, the court is to first determine what the 'lodestar' amount is, *i.e.* the total number of hours worked multiplied by the appropriate hourly rate. The court can then adjust that lodestar amount upward or downward 'for various special factors in the litigation.'" *Banker v. Univ. of Louisville Athletic Ass'n, Inc.*, 466 S.W.3d 456, 465 (Ky. 2015) (quoting *Meyers v. Chapman Printing, Co., Inc.*, 840 S.W.2d

814, 816 (Ky. 1992)); *Hill v. Ky. Lottery Corp.*, 327 S.W.3d 412, 429 (Ky. 2010) (lodestar calculation is "the approved means of determining a reasonable fee award in civil rights cases.").

Defendants do not address Kentucky law with respect to attorney fee awards. Instead, they rely on federal law. Defendants assert that the Court must follow *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). *Johnson* sets out twelve factors for use in determining whether to depart from the lodestar calculation. However, Kentucky has not adopted those factors. Moreover, the Supreme Court has criticized *Johnson*, finding that many of the twelve factors are accounted for in a lodestar calculation. *Blum v. Stenson*, 465 U.S. 886, 898-900 (1984) (*Johnson*'s "novelty and complexity," "special skill and experience of counsel," "quality of representation," and "results obtained" factors are subsumed in number of billable hours); *Hensley v. Eckerhart*, 461 U.S. 424, 434 n.9 (1983) (many *Johnson* factors are subsumed within initial calculation of hours reasonably expended at reasonable hourly rate); *Pennsylvania v. Del. Valley Citizens' Council for Clean Air,* 478 U.S. 546, 564-66 (1986) (same). Similarly, the Sixth Circuit Court of Appeals has rejected adherence to *Johnson*'s list, concluding that an analytical approach grounded in the number of hours expended accounts for all relevant factors and leads to a reasonable result. *Northcross v. Bd. of Educ. of Memphis City Sch.*, 611 F.2d 624, 642 (6th Cir. 1979), *modified on other grounds*.

Despite this precedent and despite the fact that Kentucky law controls, Defendants rely on the *Johnson* factors for their arguments. Based on *Johnson*'s "results obtained" factor, they argue that Smith should recover only 50% of her fees because she won only 1 of 2 claims. Defendants also rely on *Johnson* for these propositions: (1) any fee award should be capped by Smith's likely contingency fee agreement for 40% of the damages; (2) the fees should be capped at 20% of the total fees because Smith recovered only 20% of the "over $1 million" in damages

she asked the jury to award; and (3) the Court should reduce the fees sought because this case
was neither novel nor complex. These challenges are unavailing.

### 2. Reduction for Unsuccessful Claims

Kentucky law precludes reducing fees based on a ratio of successful to unsuccessful
claims. *Hill,* 327 S.W.3d at 429 ("Splitting the fee equally between the two causes of action . . .
does not represent a true effort to place a value on the services rendered by the attorneys to
vindicate the civil rights violations."). For this reason, Defendants' argument that Smith should,
axiomatically, get only 50% of the claimed fees because she won only 1 of her 2 claims fails.
Further, to the extent that Kentucky courts may look to federal law for guidance, the United
States Supreme Court and the Court of Appeals for the Sixth Circuit have both rejected
mechanical reductions based on ratios of successful claims to unsuccessful ones. *Hensley,* 461
U.S. at 438 (no error "in refusing to apportion the fee award mechanically on the basis of . . .
success or failure on particular issues."); *Waldo*, 726 F.3d at 822 ("we have 'repeatedly rejected
mechanical reductions in fees based on the number of issues on which a plaintiff has
prevailed.'") (cleaned up) (citations omitted); *Deja Vu of Nashville, Inc. v. Metro. Govt's of
Nashville & Davidson Cnty., Tenn.*, 421 F.3d 417, 423 (6th Cir. 2005) ("'court should not reduce
attorney fees based on a simple ratio of successful claims to claims raised.'") (citation omitted).

Further, the failure to succeed on one claim does not prevent a full fee award if the
plaintiff won relief on another related claim. *Banker*, 466 S.W.3d at 467 (citing *Hill*, 327 S.W.3d
at 429). Federal law is to the same effect: "the fee award should not be reduced simply because
the plaintiff failed to prevail on every contention raised in the lawsuit." *Hensley*, 461 U.S. at 435.
In cases involving a common core of facts or related legal theories, "[m]uch of counsel's time
will be devoted generally to the litigation as a whole, making it difficult to divide the hours
expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete

claims." *Id.* It is in these sorts of cases that fees should not be reduced simply because a plaintiff did not prevail on every claim she asserted. *Id.; accord Banker*, 466 S.W.2d at 467; *Hill*, 327 S.W.2d at 429; *Powell*, 486 S.W.3d at 266.

Defendants contend that because harassment and retaliation have different elements, they cannot be related. The Court disagrees. Smith's claims are related. She sued for sexual harassment and retaliation. These claims are not discrete. Smith offered evidence that Conforti engaged in what she perceived as unwelcome sexually charged conduct and she was fired for reporting it. Thus, the evidence that supported Smith's claims of harassment by Conforti also pertained to her retaliation claim. Even if Smith had sued only for retaliation, she would nevertheless need to present the same evidence of the events leading up to the retaliation. In such a situation, "splitting the fee equally between the two causes of action" would ignore that reality. *Hill*, 327 S.W.3d at 429. Indeed, "litigation is not an exact science." *Jordan v. City of Cleveland*, 464 F.3d 584, 604 (6th Cir. 2006) (cleaned up). The same events can, and often do, relate to two theories of liability even though the elements of the claims are not identical. Hence, in *Jordan*, the Court held that harassment and retaliation claims are interrelated, noting that a district court's contrary ruling would be an abuse of discretion. *Id.* at 603-04.[63]

Defendants' argument for an automatic reduction based on any contingency-fee arrangement Smith might have had likewise fails. Citing *Hill* and *Hensley*, the Kentucky Court of Appeals rejected using an agreed-to 40% contingency fee to reduce a fee award. *Clarke v. Riverside Paving and Contracting, Inc.*, 2011 WL 5314528, at *6 (Ky. Ct. App. Nov. 4, 2011) (trial court erred by reducing lodestar amount based on contingency fee contract). Again, federal law is to the same effect. Both the United States Supreme Court and the Sixth Circuit have

---

[63] Further, contrary to Defendants' argument, counsel's researching summary judgment standards regarding sexual harassment and then later researching the after-acquired evidence rule does not mandate the conclusion that harassment and retaliation are unrelated claims.

rejected using a contingency fee contract to measure or cap a fee award. *Blanchard v. Bergeron*, 489 U.S. 87, 93 (1989) (contingency fee contract does not impose automatic ceiling; to hold otherwise would be inconsistent with § 1988). Accordingly, the Supreme Court held that "[s]hould a fee agreement provide less than a reasonable fee . . . the defendant should nevertheless be required to pay the higher amount." *Id.* Similarly, the Sixth Circuit has held that a contingency fee agreement may not be a basis for a downward adjustment from an otherwise reasonable rate. *Echols v. Express Auto, Inc.*, 857 F. App'x 224, 230-31 (6th Cir. 2021) (citing *Hamlin v. Charter Twp. of Flint*, 165 F.3d 426, 438 (6th Cir. 1999)).[64]

Furthermore, Defendants' contingency-fee argument lacks a basis in fact. Defendants assert that should Smith's attorneys recover the lodestar sum of $357,642.50, they will get over "400%" more than Smith will pocket in damages. Response, DN 155 at PageID# 2278 n.30. Their math, however, does not add up. Defendants include costs in their calculation. Costs are sunk dollars. The result of a costs award is reimbursement, not windfall. Additionally, Defendants suggest that Smith's attorneys would double dip, taking 40% of Smith's $200,000 judgment in addition to the statutory fee award. There is no basis for this assumption.

Defendants' argument for capping Smith's fees to 20% of the lodestar figure fairs no better. Defendants assert that Smith sought over $1 million in damages and recovered only 20% of that figure which justifies awarding only 20% of the claimed fees. Again, their argument lacks a basis in fact. Smith did not seek over $1 million in damages. Instead, she capped her recovery to no more than $1 million. Verdict Form I, DN 132 at PageID# 1307. Thus, there is no basis on

---

[64] Defendants also cite *Farrar v. Hobby*, 506 U.S. 103 (1992) but it concerned a $1.00 nominal damage award. Smith recovered compensatory damages. Defendants cite *Tex. State Tchrs. Ass'n. v. Garland Indep. Sch. Dist.*, 489 U.S. 782 (1989). That case concerned what is necessary to be a prevailing party for purposes of 42 U.S.C. § 1988. Defendants urge the court not to follow *Marshall v. Rawlings Co, LLC*, 2018 U.S. Dist. LEXIS 101429 (W.D. Ky. June 15, 2018). In *Marshall*, the court refused to reduce fees by 50% because plaintiff won only 2 of 4 claims. *Id.* at *33-36. Defendants distinguish *Marshall* on the ground that the case lacked evidence of a non-discriminatory reason for firing the plaintiff. The court's fee opinion, however, does not rely on or even mention the reason for plaintiff's termination.

which to conclude that she recovered only 20% of the amount she sought. Further, *Murphy v. Vaive Wood Prods. Co*, 802 F. App'x 930 (6th Cir. 2020), on which Defendants rely, does not rescue them. In *Murphy*, the defendant likewise misstated the plaintiff's damage request for the purpose of arguing that the award should be capped in a commensurate way. The district court rejected that argument and the Sixth Circuit found it did not err in doing so. *Id.* at 936-37.

As well, adopting Defendants' 20%-of-damages-sought argument would not differ from using a ratio of successful to unsuccessful claims to mechanically reduce a fee award—an approach soundly rejected by both Kentucky and federal courts. *Hensley,* 461 U.S. 424; *Hill,* 327 S.W.3d 412; *Clarke*, 2011 WL 5314528; *Waldo*, 726 F.3d 802; *Deja Vu*, 421 F.3d 417. Given the Kentucky courts' and the federal courts' consistent rejection of such an approach, the Court will not adopt such an approach here.

### 3. Reduction for Lack of Novelty and Complexity

Defendants urge the Court to reduce Smith's fees because her case was neither novel nor complex, relying on *Johnson*, 488 F.2d 714. Novelty and complexity are not factors that Kentucky courts consider in deciding to depart from a lodestar figure. *Boden v. Boden*, 268 S.W.3d 632, 633 (Ky. 1954) (listing factors). Further, even if federal law applied, separate consideration of "novelty and complexity" would be unwarranted. Such issues are subsumed in a court's lodestar calculation, specifically in its consideration of whether the hourly rates and hours spent are reasonable. *Hensley*, 461 U.S. at 438; *Blum*, 465 U.S. at 898; *Del. Valley Citizens' Council for Clean Air,* 478 U.S. at 564-66; *Northcross*, 611 F.2d at 642.

Beyond that, Defendants' argument lacks credibility. Smith asserts that by refusing to admit they jointly employed her, Defendants necessitated "additional layers of discovery and development of proof at trial." Motion, DN 139-1 at PageID# 1435. She does not argue that the joint employer doctrine presented a "novel" issue. Yet, Defendants assert she does so. Response,

DN 155 at PageID# 2277 ("Plaintiff's counsel asserts that the 'novel' question of joint employer and time spent in developing their evidence to prove same required significant additional time and effort."). As for time spent, the record supports Smith's position and contradicts Defendants' assertion that she spent "little time" at trial on the issue. *See* Plaintiff's Reply, DN 161 at PageID# 2633-34 (illustrating same).

Next, Defendants assert that because Smith's claims have a statutory basis, they are less complex than common law tort claims. Defendants do not provide a rationale for this assertion. Nonetheless, the source of a right does not preordain the amount of time that counsel must spend vindicating that right or the degree of complexity which the particular case's facts create or the measure of skill required to present evidence in a cogent and convincing manner. Lastly, citing the Kentucky Bar Association's website, Defendants state that there are "over one thousand" employment-law attorneys in Kentucky. Thus, according to Defendants, "higher fees" for such services are not required. Response, DN 155 at PageID# 2277. Defendants offer no rationale for their conclusion. And, even if the Court assumes the list is accurate, the sheer number of such attorneys does not speak to differing levels of experience and degrees of skill. Defendants do not contend that Smith's counsel's $350 hourly rate is too high given their particular experience. Indeed, elsewhere Defendants concede that attorneys Royse and Ransdell have extensive employment law experience. Response, DN 155 at PageID# 2281.

### 4. Reductions for Block Billing and Vague Entries

Defendants complain about billing entries on pages 3, 4, 5, 6, 7, 10 and 17 of Smith's tendered records. They contend that these pages contain descriptions which "lack[ ] sufficient detail to identify the specific work performed or to link the tasks to particular claims." Suppl. Response, DN 193 at PageID# 3615. They assert that "work on discovery responses," "work on discovery issues," and "trial prep" are each too vague such that there is no way to justify a fee

award for the work performed. They contend that such entries "provide little to no information regarding the actual tasks completed or how they relate to the case." *Id.* The Court disagrees. These types of descriptions are standard.

Further, "work on discovery responses" is self-explanatory and the way in which such work relates to a civil suit is evident. As well, Defendants are able to discern the procedural posture of this case on the dates to which the billing entries relate and thereby likewise discern what discovery disputes were then at issue. The same is true for a "trial prep" description and for Defendants' contention that they cannot discern for which depositions Smith's counsel was preparing. Moreover, several of the descriptions as to trial prep include additional detail. Upon review, the Court finds that the descriptions are sufficient. *Laney v. Getty*, 2014 U.S. Dist. LEXIS 147051 (E.D. KY Oct. 14, 2014) on which Defendants rely does not compel a contrary conclusion. Instead, there, as here, "[t]he majority of the billing entries, when taken in the context of the time period and the corresponding proceedings, are sufficiently descriptive of the tasks performed by the attorneys." *Id.* at *11-12.

Next, Defendants assert that an August 16, 2022 block billing entry should be discounted because the tasks are not itemized. Defendants also assert that this entry spans "different stages of litigation," rendering it "impossible to measure the reasonableness of the time spent". Suppl. Resp., DN 193 at PageID# 3617. The Court sees nothing manifestly wrong with this entry. The total time spent was 2.2 hours and includes time spent on deposition preparation, emails to defense counsel and Smith, and interrogatory answers. The work took place on one day and does not span different litigation stages. The tasks are compensable and Ransdell has submitted an affidavit attesting to the validity of his time entries. The Court will not exclude this time.[65]

---

[65] Defendants rely on *Perry v. AutoZone Stores, Inc.*, 624 F. App'x 370 (6th Cir. 2015). In *Perry*, appellate counsel spent 143 hours to prepare their brief. The court found 143 hours to be excessive because many of the issues had

### 5. Reductions For Administrative Tasks

Defendants argue that counsel's time on page 22, line 345 is not compensable because it consists of administrative work. The Court disagrees. That entry is for time spent by attorney Royse; it reads: "Work with Keith on order of proof and key proof elements and exhibits for each witness." The entry describes work necessary to trying the case, not administrative tasks. Next, Defendants assert that the work described on lines 366, 367, 369, 371, 372, and 373 of Smith's records is administrative and not compensable. Line 367 describes research and writing a memo of law. Similarly, line 369 does not describe administrative tasks; it reads: "Prepare outline and testimony excerpts for Lindsay Rockwell Cross-examination; Prepare exhibits; Further review of prior testimony." Line 373 reads: "Research on after-acquired evidence jury instruction; Conference with Keith Ransdell re: same; Revise proposed instruction." This is all trial work.

Lines 366, 371, and 372 include time spent traveling. Defendants rely on *Sweeney v. Crigler*, 2020 U.S. Dist. LEXIS 224144 (E.D. Ky. Oct. 27, 2020), a magistrate judge's report, for excluding the travel time. In *Sweeney*, the magistrate judge recommended "full compensation for travel" based on local practice in the Eastern District of Kentucky. *Id.* at *9. Thus, *Sweeney's* holding does not support Defendants. Even so, the magistrate judge did note a case for the opposite conclusion based on local practice in the Western District of Kentucky: *ACLU of Ky., Inc. v. Grayson Cnty.*, 2008 U.S. Dist. LEXIS 96800 (W.D. Ky. Nov. 25, 2008). In *Grayson*, the court stated that in the Western District unless an attorney performed legal work while traveling, fees for travel were not awarded. *Grayson*, like *Sweeney*, was a § 1983 case; thus, federal law

---

already been briefed to the district court. Dozens of the descriptions were "prepare and draft appellate brief." Thus, the court could not determine what required the atypical amount of time spent. *Id.* at 373. So, the court reduced the fees by 15%. The August 16, 2022 entry about which Defendants complain here does not present a like circumstance.

governed the fee award. Here, Kentucky law controls. Defendants do not cite a Kentucky case which holds fee awards for travel time are impermissible. This Court has found none. Absent Kentucky law to the contrary and given Smith's attorneys are located in the Eastern District, the Court will not exclude fees incurred for traveling.[66]

### 6. Reductions for Duplicative Entries

Defendants contend that Smith's counsel spent 19.9 hours "'work[ing] on jury instructions'" which might have been excessive because the billing entries do not allow the Court to determine if one lawyer was performing substantive work and the other was serving as a reviewer or editor. Suppl. Resp., DN 193 at PageID# 3618; *id.* at n.24 (citing Smith's tendered billing records at p. 15, Lines 242, 243, 244, 245, 246, 248 and 249).[67] This argument has no basis in fact. The entries reflect work done by Ransdell in November 2023. There are no overlapping entries for work done by Royse.[68]

In sum, Defendants have not articulated a meritorious objection to Smith's motion for $357,642.50 in attorney fees. Their core arguments for an across-the-board reduction for failure to succeed on all claims are contrary to law, and their challenges to specific entries lack bases in fact and/or are likewise unsupported by governing law. Smith has provided sufficiently detailed billing records and unchallenged affidavits to support the time spent and the hourly rates. Given these circumstances and Smith's success in vindicating her civil rights against all three Defendants, the Court finds that a fee award of $357,642.50 is warranted.

---

[66]Travel between Lexington and Louisville, Kentucky takes about 1.5 hours. Accordingly, the total travel time described in these entries would be 6 hours. $350.00 x 6 = $2,100.00. The remaining time relates to legal work.

[67] Defendants ask the Court to deny "all fees that follow this pattern." *Id.* at PageID# 3619. However, they have not identified any additional billing entries for the Court's review.

[68] Line 250 shows that on a different day, Royse revised jury instructions. Thus, the Court can discern Royse's separate role.

**E. Competing Bills of Costs**

Federal Rule of Civil Procedure 54(d)(1) and 28 U.S.C. § 1920 govern costs awards in diversity actions. *Wms. v. Hevi-Duty Elec. Co.*, 122 F.R.D. 206, 210 (M.D. Tenn. 1988). Under Rule 54(d), "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." FED. R. CIV. P. 54(d). This Rule "establishes a norm of action: prevailing parties are entitled to their costs as of course." *White & White, Inc. v. Am. Hosp. Supply Corp.,* 786 F.2d 728, 731 (6th Cir. 1986) (internal quotation marks and citation omitted). Section 1920 sets out the types of costs that are recoverable under Rule 54(d). *Crawford Fitting Co. v. J.T. Gibbons*, *Inc.*, 482 U.S. 437, 441 (1987). Those costs include:

> (1) Fees of the clerk and marshal;
>
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
>
> (3) Fees and disbursements for printing and witnesses;
>
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
>
> (5) Docket fees under section 1923 of this title;
>
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920. Costs must also be reasonable and necessary in amount. *BDT Prods., Inc. v. Lenmark Intern., Inc.,* 405 F.3d 415, 417 (6th Cir. 2005). The party being taxed has the burden of showing that taxing the costs sought would be improper. *Id.* at 420.

**1. Smith's Bill of Costs**

Smith seeks $10,400.70 in costs for (1) clerk fees, (2) fees for printed/recorded transcripts and (3) witness fees. DN 138 at PageID# 1386. These costs are allowable, reasonable and

necessary. Indeed, Defendants have not objected, and the Court sees nothing untoward about Smith's Bill. Fees for printed/recorded transcripts ($9,715.95) comprise most of the total expense for these categories, and they are supported by invoices. However, Smith also seeks $569.00 for service of process and for service of subpoenas via the Kentucky Secretary of State and private process servers. Such costs are not allowed. Service-of-process fees are taxable only when service was through the U.S. Marshals. 28 U.S.C. § 1920(1); *Phoenix Versailles Indus. Invs. LLC v. Bourbon Pallet Dreams, L.L.C.*, 2024 WL 476861, at *3 (E.D. Ky. Feb. 7, 2024); *GPH Louisville Hillcreek LLC v. Redwood Holdings, LLC*, 2024 WL 1913201, at *5 (W.D. Ky. May 1, 2024). Accordingly, the Court shall direct the Clerk to tax costs against Defendants in the amount of $10,400.70 ($10,969.70 – $569.00).

### 2. Defendants' Bill of Costs

Defendants seek costs in the amount of $20,294.08. Smith has objected. She contends that Defendants are not entitled to costs because they are not the prevailing parties. She also objects to certain costs on the ground that they are not allowable. These objections are well-taken. Defendants are not the prevailing parties. Smith is. Smith crossed the threshold to "prevailing party" status by succeeding on her retaliation claim. Her having lost on her sexual harassment claim, contrary to Defendants' argument, does not affect her prevailing party status. *Woods v. Willis*, 631 F. App'x. 359, 364 (6th Cir. 2015) ("courts do not look to the number of claims on which the plaintiff succeeded, the magnitude of the relief obtained, or whether the plaintiff obtained the primary relief sought; the question is simply whether the plaintiff has won on at least one claim."). Further, "[f]or the purposes of costs and fees, there can be only one winner." *Shum v. Intel Corp.*, 629 F.3d 1360, 1367 (Fed. Cir. 2010). Because Smith is the

prevailing party, Defendants are not entitled to any costs and the Court need not consider Smith's objections to the specific costs Defendants seek.[69]

## F. Leave to Contact Jurors

Defendants' motion for leave to contact the jurors will be denied. "The decision whether to allow attorneys to interview jurors after a trial lies in the sound discretion of the trial judge." *Wilkerson v. Johnson*, 699 F.2d 325, 330 (6th Cir. 1983). Defendants have not provided the Court with any basis for their request. And, to the extent they seek to ask jurors their reasons for their verdict, such "is not a proper subject of inquiry." *Id.* (citation omitted); *Tschira v. Willingham,* 135 F.3d 1077, 1089 (6th Cir. 1998) ("A principal purpose of refusing a request to interrogate a jury following the verdict is to prevent 'fishing expeditions in search of information with which to impeach jury verdicts.'") (citation omitted); *U.S. v. Odunze*, 278 F. App'x 567, 573 (6th Cir. 2008) ("As the Supreme Court explained long ago, if courts licensed litigants to attack verdicts based upon juror testimony, every defeated litigant would 'harrass[ ] and beset' jurors 'in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict.'") (quoting *McDonald v. Pless*, 238 U.S. 264, 267 (1915)).

## CONCLUSION

For the reasons set forth herein, it is **ORDERED** as follows:

1. The Clerk of Court is hereby **DIRECTED** to remove the document filed as DN 139-2 and replace it with the unredacted versions of Plaintiff's billing records;

2. Plaintiff Smith's Bill of Costs **(DN 138)** is **APPROVED in part** and **DENIED in part**; the Clerk of Court is hereby directed to tax costs against Defendants in the amount $10,400.70;

---

[69]Even so, Defendants' Bill does run afoul of § 1920, seeking substantial sums for "fees associated with litigation" ($11,920.67) which include things like the cost of gummy bear snacks for trial counsel; fees for postage ($4,155.25); a mediator's bill ($645.00) and service of subpoenas ($126.90).

3.   Plaintiff Smith's Motion for Attorney Fees **(DN 139)** is **GRANTED**; the Court will enter a separate supplemental judgment consistent with this Order, awarding Smith attorney fees in the amount of $357,642.50;

4.   Defendants' Bill of Costs **(DN 143)** is **DENIED**;

5.   Defendants' Motion for Approval **(DN 162)** is **DENIED**;

6.   Defendants' Motion for a Judgment or New Trial **(DN 163)** is **DENIED**; and

7.   Plaintiff Smith's Motion to Strike **(DN 165)** is **DENIED**.

This is a final and appealable Order, there being no just cause for delay in its entry.